UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DRUSILLA JENNINGS,

                Plaintiff,                No. 05-CV-73560-DT

vs.                                Hon. Gerald E. Rosen

COUNTY OF WASHTENAW
and LARRY KLOSS,

                Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      February 28, 2007     

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I. INTRODUCTION

In this Section 1983/Whistleblowers' Protection Act action, Plaintiff Drusilla

Jennings is suing her former employer, Washtenaw County, and her former supervisor,

Larry Kloss, alleging that she was discharged in retaliation for exercising her

constitutionally protected right of free speech and for engaging in protected activity under

the Michigan Whistleblowers' Protection Act, M.C.L. § 15.428 (the "WPA"). This

matter is presently before the Court on Defendants' Motion to Dismiss and/or for

Summary Judgment. Plaintiff has responded to Defendants' Motion and Defendants have

1

replied.  Having reviewed and considered the parties' briefs and supporting evidence, and having heard the oral argument of counsel at the hearing conducted on February 22, 2007, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

Plaintiff Drusilla Jennings was hired by Washtenaw County in October 2004 to work as a temporary "relief staff" employee at the County's Juvenile Detention Center (the "JDC").  The JDC is a residential facility housing certain juveniles who have been accused or found guilty of committing crimes.  To secure the custody and monitoring of the residents at the JDC, the County employs Youth Attendants.  In her capacity as a temporary "relief" employee, Plaintiff substituted for regular Youth Attendants when they were absent from work.

While she was a "relief" employee, Plaintiff made several complaints to her supervisor, Larry Kloss, about several issues which she felt jeopardized the safety of the staff and the detainees.  These concerns included permitting detainees to use curling irons; allowing staff members to pluck detainees' eyebrows; and one incident when she observed a officer enter the Center wearing his weapon in his hip holster (rather than checking it in a locker, as required).  However, these various complaints do not appear to have had an adverse effect on Plaintiff's employment as she was subsequently promoted

2

on May 15, 2005 to a full-time "32-hour" Youth Attendant position.[1]

Once She became a full-time Youth Attendant, Plaintiff worked the midnight shift along with two other Youth Attendants, Michelle Douglas and Jason Reed.  Larry Kloss continued to be Plaintiff's supervisor.

On June 25, 2005, both Ms. Douglas and Mr. Reed were absent and two other Attendants, Abigail Rowe and Kevin Morrison, both of whom normally worked different shifts, filled in.  Ms. Rowe, being the most senior staff member on duty that night was the "Designated Person In Charge" ("DPI") in the absence of the shift supervisor.

At approximately 11:30 p.m., Plaintiff observed that Ms. Rowe allowed one of the detainees to get up and take a shower.  Because there are only three employees on duty on the midnight shift, detainees are not allowed to shower during that shift.[2]  Plaintiff felt that, by allowing a youth to take a shower unsupervised late at night, Ms. Rowe had

---

[1]   Prior to her promotion to a full-time Youth Attendant, Plaintiff had no union protection and no seniority rights.  Once she was promoted to the full-time position, she became covered under the County's collective bargaining agreement with AFSCME Local 2733, the Union that represented Youth Attendants.  However, pursuant to the provisions of the CBA, for the first six months in her full-time position, Plaintiff was considered a probationary employee who the County could discharge at any time with or without cause.  Further, as a probationary employee, Plaintiff's union rights were limited. While the CBA provided that the "Union shall represent probationary employees for the purpose of collective bargaining in respect to rates of pay, wages hours of employment and other conditions of employment," it specified that probationary employees were not entitled to any representation in connection with discipline or discharge other than when the employee is disciplined or discharged for union activity.  *See* CBA, Article 11, ¶¶ A, B, Defendants' Ex. 2.

[2]  Because she normally worked the day shift, Ms. Rowe apparently was not familiar with the "no shower on the midnight shift" rule.

3

created an unsafe work environment.[3]  Plaintiff expressed her concern to Kevin Morrison, the other Youth Attendant filling in that night, and Mr. Morrison confirmed that Ms. Rowe was not supposed to allow the detainees to shower during the midnight shift.

Plaintiff, however, did not address her concerns with Ms. Rowe.  Instead, the following evening, Plaintiff reported Ms. Rowe's conduct to Supervisor Larry Kloss.[4] Plaintiff testified that, in reporting the incident to her supervisor, she did not want to see Ms. Rowe punished; all she wanted was for Mr. Kloss "to make it noted that this is a concern." [Plaintiff's Dep., p. 26.]  Kloss agreed with Plaintiff that if Ms. Rowe had allowed a detainee to shower during the midnight shift, it would constitute a breach of security.   To confirm Plaintiff's allegations, Kloss immediately reviewed the security videotape from the previous night.  The videotape confirmed what Plaintiff had reported. He then sent an e-mail to  JDC's Facility Manager, Lisa Greco, and Ms. Rowe's supervisor, George Brieloff, the individuals who would be responsible for taking disciplinary action against Ms. Rowe. [*See* Defendants' Ex. 3.][5]

_____

[3] From the deposition testimony of the various witnesses, it appears that, normally, JDC detainees are restricted to their rooms during the midnight shift.

[4] During her conversation with Mr. Kloss, Plaintiff also expressed concern about the conduct of another staff member who would, on occasion, leave the building during the midnight shift to have a cigarette in the parking lot.  Kloss later discussed this cigarette-break complaint at a supervisors' meeting, but the supervisors, as a group, concluded that as long as the staff member remained in radio contact and the other two staff members remained in the detention center, a brief period away from the detention center was permissible.

[5] Kloss's e-mail details what he saw on the videotape:

The same night that Plaintiff reported Ms. Rowe's actions to Mr. Kloss, she also discussed the incident with her co-worker on the midnight shift, Michelle Douglas. Ms. Douglas agreed with Plaintiff that she needed to report the incident as it was a safety violation. She also discussed it with her other midnight shift co-worker, Jason Reed. Like Mr. Kloss and Ms. Douglas, Mr. Reed agreed that Ms. Rowe had committed a safety violation.

Shortly after speaking with Plaintiff about Abigail Rowe's breach of security, Michelle Douglas approached Ms. Rowe's day-shift supervisor, George Brieloff, and told him that Plaintiff had complained to her that she did not expect Ms. Rowe to suffer any consequences for her actions because she [Rowe] was involved in a sexual relationship with Brieloff and Facility Manager Lisa Greco. On June 29, 2005, Brieloff related his

------

DPI Abigail Rowe was on duty with regular staff Drusilla Jennings and relief staff Kevin Morrison. Apparently, Ms. Rowe was concerned that detention youth Austin Ford had not received a shower during the afternoon shift that day. The videos show Ms. Rowe escorting Austin into the processing area, retrieving items from the laundry room as Austin follows her into the laundry room, sitting at the processing desk while Austin showers, and leaving Austin in the shower room with the laundry door open when she goes into the Control. It should be clear to all staff that during the midnight shift we keep direct physical contact between youth and staff to an absolute minimum. We simply do not have adequate staffing on midnights to briefly open youths' room doors safely, let alone to bring them into the processing area with the laundry room open. . . . I can appreciate that Ms. Rowe felt she was acting in the best interest of the youth, but I am disturbed that in the process, she acted with a haphazard disregard for her own safety and the safety of other staff. . . .

[Defendants' Ex. 3.]

5

conversation with Ms. Douglas to Larry Kloss.  That same day, Brieloff approached Plaintiff in the hallway and asked to speak with her in his office.  Plaintiff testified that she felt uncomfortable with Mr. Brieloff's request because other employees, including Abby Rowe, were sitting outside Brieloff's door.  However, Plaintiff conceded that Brieloff's door was closed and she had no evidence that Ms. Rowe could overhear the conversation.[6]

According to Plaintiff, Brieloff began the conversation by informing her that he had learned about the situation involving Ms. Rowe and assured Plaintiff that it would be addressed.  He then told Plaintiff that any discipline issued to Ms. Rowe was not Plaintiff's concern and that it would be Ms. Rowe's decision whether she wanted to discuss her discipline with anyone else.  Brieloff then asked Plaintiff whether she had told Ms. Douglas that Ms. Rowe would not be disciplined because she was engaged in a sexual relationship with him, and Plaintiff denied making that statement.

The next day, June 30, 2005, there was a previously-scheduled management meeting that was attended by Larry Kloss, George Brieloff, Facility Manager Lisa Greco, Swing Shift Supervisor Tom Restrick, Business Manager Paula Baker, Director of Juvenile Detention Denise Dalrymple and Technology Specialist Cassie Sinclair.  During

---

[6] Plaintiff's brief states that Brieloff "intimidated and threatened" her and "warned her that she could lose her job."  *See* Plaintiff's Brief, p. 12.  However, the very pages of her deposition that Plaintiff cites as support for these statements belie those assertions.  Although Plaintiff testified that she *felt* harassed and intimidated, she categorically denied that Brieloff ever threatened her with termination.  *See* Plaintiff's Dep., pp. 70-71.

that meeting, Mr. Kloss informed the group about Ms. Rowe having allowed a youth to take a shower during the midnight shift.  The management team agreed that Ms. Rowe had committed a safety violation, and that as she was a full-time union employee, the matter should be handled with progressive discipline.  Consistent with the progressive discipline measures set forth in the union contract, Ms. Rowe was issued a written reprimand for her conduct.[7]

Mr. Kloss also told the management team about George Brieloff's discussion with Michelle Douglas concerning Plaintiff having expressed the opinion that Ms. Rowe would not be disciplined because she was having a sexual relationship with Brieloff and/or Facility Manager Greco.  Kloss explained that he wanted guidance from the management team on how to proceed.  Business Manager Paula Baker said that because Plaintiff was a probationary employee, she should be discharged immediately for making

---

[7] The Collective Bargaining Agreement entered into between Washtenaw County and AFSCME Local 2733, the union representing JDC workers, provides, in pertinent part:

> In any case where an employee displays behavior which is deemed by his/her Employer as inappropriate, or as a result of some action creates undesirable results which requires disciplinary action, the Employer agrees to, where appropriate, follow the following disciplinary sequence,
>
> 1. Oral warning
> 2. Written Reprimand
> 3. Suspension
> 4. Removal and Discharge.

CBA Art. 10, ¶ B.

such a comment.  Mr. Brieloff and Ms. Greco, however, defended Plaintiff and said that she should not be discharged because she was a good employee.

The day after the management meeting, Mr. Kloss contacted both Plaintiff and Michelle Douglas about Ms. Douglas' allegations.  He first contacted Ms. Douglas and asked her whether she had told George Brieloff that Plaintiff had stated that Ms. Rowe would not be disciplined because of her relationship with Brieloff and/or Lisa Greco.  Ms. Douglas responded that Plaintiff had made that statement and that she [Douglas] had reported it to Mr. Brieloff.  Ms. Douglas indicated, however, that she did not believe anyone else heard Plaintiff make the comment.  Kloss, therefore, encouraged Ms. Douglas to have a positive outlook and to act professionally toward Plaintiff.

Kloss later spoke with Plaintiff and informed her of Ms. Douglas' allegations.  He also told her that those allegations had been discussed at the recent management meeting and informed her that one person at the meeting had recommended that she be terminated but that Ms. Greco and Mr. Brieloff had stuck up for her.  Plaintiff, however, denied telling Ms. Douglas that Ms. Rowe would not be disciplined due to her sexual relationship with Brieloff or Greco.  Having only Ms. Douglas' allegations to go on, Kloss decided not to make a determination at that point as to whether or not Plaintiff had made the statement.  Instead, he simply encouraged Plaintiff to communicate with Ms. Douglas and to act professionally.  Kloss also stressed that the safety of the staff and the residents at the Center depended on the entire team working together professionally.

Despite having been assured by both George Brieloff and Larry Kloss that Ms.

8

Rowe's safety violation would be addressed, after her meeting with Kloss on July 1, Plaintiff decided to report her concerns to the County's Labor Relations Director, Diane Heidt, on July 5, 2005.[8]  Heidt directed Plaintiff to Rebecca Curry, the Human Resources employee who typically conducts the investigations into such matters.

When Plaintiff spoke with Ms. Curry on July 5th, she told her about Ms. Rowe's safety violation; the other alleged safety violations she had observed during her tenure at the Center; the "rumor" spread by Ms. Douglas about what Plaintiff allegedly had said about Brieloff and Abby Rowe; her meeting with George Brieloff; and her feeling "harassed" and "intimidated."

In Ms. Curry's view, the main issue raised by Plaintiff was Ms. Rowe's alleged safety violation.  Curry promptly e-mailed both Mr. Brieloff and Mr. Kloss about Plaintiff's complaint.  Brieloff told Curry that it was his opinion that Ms. Rowe had committed a safety violation and told Curry that Ms. Rowe was going to receive a written reprimand.  Kloss did not immediately receive the e-mail as he had by then left for a brief vacation.  He read the e-mail when he returned to the JDC after his vacation on June 11 and called Curry.  Like Brieloff, Kloss agreed that Rowe had committed a safety violation.  Since both Brieloff and Kloss agreed that a safety violation had been committed, and satisfied that appropriate disciplinary measures were being taken to prevent reoccurrence, Ms. Curry saw no need for further investigation.

---

[8]  Plaintiff testified that she went to Ms. Heidt because she "did not trust Mr. Brieloff to do what he said he was going to do."  *See* Plaintiff's Dep., p. 73.

9

Meanwhile, upon returning from his vacation, Kloss called Jason Reed, the most senior of the midnight shift Youth Attendants who was the Designated Person In Charge of the shift in Kloss's absence, to find out how things had gone on the midnight shift in his absence. Reed responded that things were "not good" and that it had been a "miserable" week because Ms. Douglas and Plaintiff were not speaking to one another.

Kloss also spoke with Facility Manager Lisa Greco upon his return from vacation. Ms. Greco informed Kloss that Plaintiff had told Rebecca Curry that there was a sexual relationship between Ms. Rowe and Mr. Brieloff. This led Kloss to believe that Plaintiff had, in fact, made that same statement to Michelle Douglas, as Ms. Douglas had previously reported, and that Plaintiff had lied to him when she denied it.

Kloss was also concerned that having a midnight shift where two of the three employees were not speaking to one another seriously compromised the safety and security of the youth and the staff at the Center. Kloss also felt that he had made an honest effort to encourage Plaintiff and Ms. Douglas to act professionally, but they had not heeded his advice. Therefore, after informing Facility Manager Lisa Greco of the situation, Kloss recommended that they take the most severe disciplinary measures available to them against both Plaintiff and Ms. Douglas.

Because Plaintiff was a probationary employee and it had become clear that she could not work with Ms. Douglas, Kloss determined that Plaintiff should be terminated. However, because Ms. Douglas was a full-time union employee, pursuant to the collective bargaining agreement, she was entitled to progressive discipline. [*See* CBA,

10

Defendants' Ex. 2, Art. 10 and footnote 5, *supra*.] Therefore, Kloss, could not immediately discharge Ms. Douglas for her role in the conflict.[9]

Lisa Greco agreed with Kloss's recommendation to terminate Plaintiff's employment, and directed him to prepare a termination letter. The letter that Kloss drafted on July 14, 2005 was then delivered to Plaintiff the following day, July 15th.

In the termination letter, Mr. Kloss informed Plaintiff that she was being discharged for violating Policy 3.2-A4, which states, "statements critical of colleagues or their agencies shall be made only as these are verifiable and constructive in purpose," and Policy 3.2-A13, which states that "relationships with colleagues will be of such character as to promote mutual respect within the field and improvement of quality of service." Kloss felt that Plaintiff failed to promote mutual respect and impaired the quality of service provided to the Center's youth by refusing to speak to Ms. Douglas for a week. He also felt that spreading a rumor that George Brieloff and Abby Rowe had an improper relationship constituted "critical statements of colleagues that were not verifiable or constructive in purpose." Although Plaintiff denies not speaking to Ms. Douglas for a week and denies having made the statement about Mr. Brieloff and Ms. Rowe having a sexual relationship, she admits that if she had refused to communicate with Ms. Douglas and had spread the rumor about Brieloff and Rowe, she would have been in violation of

---

[9] Kloss did, however, rate her very low on her performance evaluation on her ability to get along with co-workers.

the Center's employment policies.[10]

After she was terminated, on July 25, 2005, Plaintiff filed a report with MIOSHA of the various "safety issues and concerns" she had with the JDC. *See* Plaintiff's Dep., pp. 22-24; *see also* Plaintiff's Ex. 13. Plaintiff admits that MIOSHA saw no actionable occupational safety violations. *Id.* at 23-24. She testified that the MIOSHA representative she had met with suggested that an attorney might be more interested in what she had to say. *Id.*

On September 15, 2005, Plaintiff filed the instant action. In her three-count Complaint, Plaintiff asserted a Section 1983 claims against her employer, Washtenaw County, and her supervisor, Larry Kloss, alleging retaliatory discharge in violation of the First Amendment to the United States Constitution (Count I). She also alleged a claim of violation of Article I, § 5 of the Michigan Constitution of 1963 (Count II), and a claim of violation of the Michigan Whistleblowers' Protection Act against the County, only (Count III). However, in her Response to Defendant's Motion for Summary Judgment, Plaintiff withdrew her claim of violation of the Michigan Constitution. Therefore, only her Section 1983 First Amendment claim and her Whistleblowers' Protection Act claim remain for adjudication.

III. <u>DISCUSSION</u>

---

[10] Plaintiff further maintains that even if she had made the statement about Brieloff and Rowe having a sexual relationship it would be protected speech as it was made in connection with the reporting of safety violations.

12

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[11]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

---

[11]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

13

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendants' Motion for Summary Judgment in this case.

B.   PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY
     COGNIZABLE FIRST AMENDMENT CLAIM

To establish a cognizable claim of retaliatory discharge in violation of the First Amendment , Jennings must demonstrate: (1) that she was engaged in a constitutionally protected activity; (2) that the defendants' adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the

14

exercise of her constitutional rights. *Nair v. Oakland County Comm. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006); *Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 965 (6th Cir. 2002) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 705 (6th Cir. 2001)).

In establishing the first prong of the test, Plaintiff must establish that the speech she engaged in is "protected." *See Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003); *Haynes v. City of Circleville, Ohio*, 474 F.3d. 357, 362-65 (2007). To do so, Plaintiff must first show that she spoke as a citizen on a matter of public concern. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty*., 391 U.S. 563, 568, 88 S.Ct, 1731 (1968); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684 (1983); *Garcetti v. Ceballos*, ___ U.S. ___, 126 S.Ct. 1951, 1958 (2006). This is a question of law for the court to decide. *Connick*, *supra*, 461 U.S. at 148 n. 7; *Haynes, supra; Nair v. Oakland County, supra.* If the answer is "no," the inquiry ceases and Jennings has no First Amendment cause of action based on her employer's reaction to the speech. *Garcetti, supra*; *Connick*, *supra* 461 U.S. at 147. If the answer is "yes," however, Jennings must then show that her interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer. *Pickering, supra*, 391 U.S. at 574; *see also Garcetti, supra.*

1. PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE
   WAS SPEAKING "AS A CITIZEN"

The threshold inquiry is whether Plaintiff was speaking in her capacity "as a

15

citizen." *See Garcetti*, *supra.*  In *Garcetti,* the Supreme Court held that, while the First

Amendment limits the ability of a public employer to leverage the employment

relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their

capacities as private citizens,

> [W]hen public employees make statements pursuant to their official duties,
> the employees are not speaking as citizens for First Amendment purposes,
> and the Constitution does not insulate their communications from employer
> discipline.

*Garcetti, supra*, 126 S. Ct. at 1960.[12]

In *Garcetti*, the plaintiff, Richard Ceballos, a Los Angeles deputy district attorney,

who was assigned as the "calendar deputy" during the relevant time period, wrote a

memorandum to his supervisors explaining his investigation and concerns that an

affidavit written by an deputy sheriff to obtain a search warrant of a defendant's home

contained a number of inaccuracies and recommending that the prosecutor dismiss the

case against the defendant.  According to Ceballos, it was not unusual for calendar

deputies to investigate aspects of pending cases.

Based on the Ceballos' statements, a meeting with the prosecutors and sheriff's

department employees was held to discuss the affidavit.  The meeting allegedly became

heated and Ceballos was sharply criticized for his handling of the matter.  Despite

_____

[12]  Although *Garcetti* was decided several months before briefing began in this
matter, neither Plaintiff nor Defendants addressed, or even mentioned, *Garcetti* in any of
their briefs and both counsel admitted at the February 22, 2006 hearing that they were not
familiar with the decision.

16

Ceballos' concerns, the prosecutor decided to go forward with his prosecution, pending disposition of a defense motion to quash the warrant and suppress the evidence.

Ceballos was subsequently called to testify at the suppression hearing to recount his observations about the affidavit. The trial court ultimately rejected the challenge to the warrant and the prosecution proceeded.

Ceballos, however, claimed that after he wrote the memo criticizing the warrant affidavit, he was subjected to a series of retaliatory employment actions, including his reassignment from his calendar deputy position, transfer to another courthouse, and denial of a promotion. When his administrative grievance of the matter failed, he instituted an action in federal district court under 42 U.S.C. § 1983 claiming violation of his First and Fourteenth Amendment rights.

The district court granted the defendants' motion for summary judgment finding that Ceballos was not entitled to First Amendment protection for the memo's contents because he wrote it pursuant to his employment duties. The Ninth Circuit Court of Appeals reversed, finding that the Ceballos' memorandum addressed matters of public concern and, hence, constituted protected speech under the First Amendment.

The Supreme Court, however, noted that the Court of Appeals did not consider whether the speech at issue was made in Ceballos' capacity "as a citizen." This, the Court, determined is the threshold issue that must be decided.

In analyzing this issue, the Supreme Court found that the fact that Ceballos expressed his views inside his office, rather than publicly, was not dispositive. 126 S. Ct.

17

at 1959.  Nor was the fact that the memo concerned the subject matter of Ceballos'

employment dispositive, either.  *Id.*  Rather, the Court determined that "[t]he controlling

factor in Ceballos' case is that his expressions were made pursuant to his duties as a

calendar deputy."  *Id.* at 1960.

> That consideration -- the fact that Ceballos spoke as a prosecutor fulfilling a
> responsibility to advise his supervisor about how best to proceed with a
> pending case -- distinguishes Ceballos' case from those in which the First
> Amendment provides protection against discipline.

*Id.*

Thus, the Court concluded that "[r]estricting speech that owes its existence to a

public employee's professional responsibilities does not infringe any liberties the

employee might have enjoyed as a private citizen.  It simply reflects the exercise of

employer control over what the employer itself has commissioned or created."  *Id.*

The Sixth Circuit recently applied *Garcetti* in *Haynes v. City of Circleville, Ohio*,

474 F.3d 357 (6th Cir. 2007).[13]  In *Haynes*, the plaintiff was a police officer employed by

the City of Circleville.  Haynes was a patrolman for his first five years on the police

force.  In 1996, the City authorized the creation of a canine unit and Haynes became the

canine handler.  The canine unit is classified as part of the patrol unit, so Haynes was still

---

[13]  Although *Haynes* involved an appeal from a denial of qualified immunity, the
first step of a qualified immunity analysis requires the court to determine whether a
constitutional right has been violated.  *See Estate of Carter v. City of Detroit*, 408 F.3d
305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The
*Haynes* court applied *Garcetti* in deciding whether a first amendment violation had
occurred.

18

considered a patrolman, although his duties as canine handler relieved him of some of his patrol duties -- he worked as a patrol officer for 28 hours per week and spent the remaining 12 hours per week training his dog. Haynes was provided additional compensation to cover additional time spent traveling to the canine training center in Dublin, Ohio, as well as for all of his meals while training.

In 2003, Police Chief Harold Gray instituted some cost-containment measures which included a measure under which canine handlers and their dogs were allowed to train only once every three weeks instead of weekly. Also, the maximum compensation for any training in Dublin was limited to eight hours, including travel time.

Haynes was upset with this turn of events which prompted him to write a long memo to Chief Gray that expressed his displeasure at the reduction in training and speculated that "there will be serious negative consequences" as a result of the cuts. 474 F.3d at 360. The police chief responded by letter offering Haynes the choice of complying with the new training parameters or resigning from his position as canine handler. Shortly thereafter, Haynes got into a dispute with another patrolman regarding his refusal to assist with a drug search. Haynes claimed that he refused because he was feeling the effect of withdrawal from Paxil, an antidepressant medication, and that he felt unfit to come into work on the day of the drug search.

The dispute and Haynes' revelation about undergoing withdrawal effects prompted Haynes being placed on administrative leave and he was ordered to undergo a psychological examination. Under Ohio law, failure of a law enforcement officer to

19

appear for a medical or psychological examination when ordered to do so is

insubordination, punishable by discipline up to and including removal.  474 F.3d at 360

(quoting Ohio Admin. Code 123:1-33-01 (2004)).  Haynes refused to submit to the

examination and he was subsequently relieved of his duties as canine handler. After an

administrative disciplinary hearing, his employment was terminated.

Haynes subsequently filed a Section 1983 action against the City and Chief Gray

alleging that he was terminated in retaliation for exercising his First Amendment rights by

speaking out against the reduced canine-training program.  The district court denied the

Chief Gray's motion for summary judgment based on qualified immunity and the chief

appealed.

The Sixth Circuit concluded that Hayne's memo was not protected speech under

the First Amendment.  The appellate court explained:

> Haynes states that he was involved with the development of the
> canine program from its inception and that he had developed the standard
> operating procedure for the canine unit.  The thrust of Haynes's memo to
> Chief Gray was thus his concern over cutbacks in canine training.
>
> * * *
>
> In lodging his protests to Chief Gray against the training cutbacks,
> Haynes was acting as a public employee carrying out his professional
> responsibilities.  Haynes's speech is therefore unprotected as a matter of
> law because all of the speech at issue in this case, like the speech at issue in
> *Garcetti*, was made pursuant to his official duties.
>
> As a police officer, Haynes had developed the standard operating
> procedure for the canine unit and worked with his dog as part of his day-to-
> day professional activities.  His memo to Chief Gray, made pursuant to
> these professional duties, is not protected under the First Amendment.  The

20

fact that Haynes communicated solely to his superior also indicates that he was speaking in his capacity as a public employee. . . , not as a member of the public writing a letter to the editor as in *Pickering*.

At the time that Haynes sent his memo in February 2003, he was simply speculating that someday there could be a negative incident that might result from the reduction in canine training.  Haynes's memo focused on his discontent with the new program. . . .  The memo thus reflect nothing more than the quintessential employee beef:  management has acted incompetently.

474 F.3d at 364-65. (Citations and some internal punctuation omitted.)  *See also Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that a police sergeant's speech was not protected under *Garcetti* where the sergeant was "on duty, in uniform, and engaged in a discussion with her superiors."); *Freitag v. Ayers*, 468 F.3d 528, 545-46 (9th Cir. 2006) (internal complaints by a correctional officer to supervisors within the prison held not protected because they were submitted pursuant to her duties as a correctional officer).

Turning to the instant action, Plaintiff Jennings testified in her deposition that one of her job duties at the JDC was to enforce safety. [Plaintiff's Dep., p. 107.] She further acknowledged that the safety philosophy provision of the JDC employee handbook urged employees "to be alert to safety issues" and directed that they "should report unsafe conditions to their supervisors." [*See* Plaintiff's Dep. at 27].   It was pursuant to her safety obligations that Plaintiff reported Abigail Rowe's safety violation to her supervisor, Larry Kloss, so that "everyone [would] have a safe working environment."  *Id.* at 26. Plaintiff's deposition testimony makes clear that, as was the case with the plaintiffs in

*Garcetti* and *Haynes,* in reporting the Abby Rowe incident to her supervisor, Plaintiff Jennings was acting as a public employee carrying out her professional responsibilities. Jennings' speech is therefore unprotected as a matter of law because the speech at issue was made pursuant to Plaintiff Jennings' official duties.  She was not, therefore, speaking "as a citizen" on a matter of public concern.[14]

### 2.   PLAINTIFF'S SPEECH DID NOT ADDRESS "A MATTER OF PUBLIC CONCERN"

The Court also finds that Plaintiff's speech did not involve "a matter of public concern."  While it is true that, as a general proposition, a "public concern" is one relating to "any matter of political, social or other concern to the community," *Connick v. Myers*, *supra*, 461 U.S. at 146, whether the speech addresses a matter of public concern is to be determined by looking to the "content, form, and context of a given statement, as revealed by the whole record."  *Id.* at 147-48; *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 229

---

[14]  To the extent that Plaintiff claims that her alleged statements that Abigail Rowe would not be disciplined because Rowe and George Brieloff and/or Lisa Greco, were involved sexually are also protected under the First Amendment, Plaintiff is mistaken.  As the Supreme Court made clear in *Connick v. Myers*, *supra*, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum" to review a public employer's employment decision regarding that employee.  461 U.S. at 147.  *See also Nair v. Oakland County Comm. Mental Health Auth.*, *supra*.  Plaintiff's statements regarding Mr. Brieloff, Ms. Greco, and Ms. Rowe and the discipline (or lack of discipline) meted out against her, thus, are nothing more than "internal personnel disputes" which fall outside the scope of First Amendment-protected speech. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).

(6th Cir. 2005).  This is also a question of law to be decided by the court.

The mere fact that the employee's job dealt with public health or welfare -- which, in a general sense, concerns the public -- does not make the employee's speech a matter of public concern.  443 F.3d at 479.  *See also, Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) (complaints about police management are not transformed into statements of public concern merely because police are charged with securing public safety); *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003) (statements concerning internal personnel disputes do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech.  *Id.* at 596. (Citations omitted).)

Moreover, a matter does not become one of public concern simply because in other circumstances, its subject matter might be of public interest.  *Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 965 (6th Cir. 2002).  The point of protection afforded public employees is to allow public employees a voice on issues actually affecting and of interest to the community at large.  *Id.*  Thus, the fact that what might be "incidentally conveyed" by the speech, or that the speech contains "passing" or "fleeting" references to an arguably public matter do not elevate the speech to a matter of "public concern" where the "focus" or "point" of the speech advances only a private interest. *Farhat v. Jopke,* 370 F.3d 580, 592-593 (6th Cir. 2004) (citations omitted).

In this case, although Plaintiff maintains that she was motivated in reporting the Abby Rowe incident, in part, by her concern for the safety of the community, it is clear from her deposition testimony that the "focus" of her speech was not the *public*'s safety,

23

but rather only that the JDC employees have a "safe and comfortable" working environment.

The foregoing establishes that Plaintiff was not speaking "as a citizen on a matter of public concern" when she reported Abigail Rowe's safety violation to her supervisor at the Juvenile Detention Center.  Therefore, her speech is not entitled to First Amendment protection.  As such her allegations of unconstitutional retaliation must fail.

C.    PLAINTIFF HAS FAILED TO MAKE OUT A WHISTLEBLOWERS'
      PROTECTION ACT CLAIM

The Michigan Whistleblowers' Protection Act, M.C.L. § 15.362 (the "WPA"), provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action.

M.C.L. 15.362.

The Michigan Supreme Court has noted that the Whistleblowers' Protection Act's main purpose is to alleviate "the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large businesses." *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 75, 503 N.W.2d 645 (1993).

In analyzing actions under the WPA, Michigan courts have adopted the shifting-

burden framework used in Title VII and Michigan Civil Rights Act cases.  *Taylor v. Modern Engineering, Inc.*, 252 Mich. App. 655, 653 N.W.2d 625 (2002); *Hopkins v. City of Midland*, 158 Mich. App. 361, 380-81, 404 N.W.2d 744 (1987).  Therefore, to establish a *prima facie* claim of retaliation under the WPA, Plaintiff must establish that (1) she engaged in a protected activity as defined in the WPA; (2) she was discharged; and (3) a causal connection existed between the protected activity and her discharge. *Shallal v. Catholic Social Services of Wayne County*, 455 Mich. 604, 610, 566 N.W.2d 571 (1997).

1.     PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE
       WAS ENGAGED IN A PROTECTED ACTIVITY UNDER
       THE STATUTE

a.     Plaintiff Did Not Report Her Suspected Safety Violations to a
       "Public Body" Prior to Her Discharge

Plaintiff does not dispute that she cannot base her Whistleblowers' claim on the

report she made with MIOSHA on July 25, 2005 because she did not contact MIOSHA

until *after* she was terminated.  She cannot claim that she was fired in retaliation for a

report made after-the-fact.  Instead, Plaintiff bases her WPA claim on her reporting of

alleged "safety concerns" to her supervisor at the JDC, Defendant Larry Kloss; to

Washtenaw County's Labor Relations Director Diane Heidt; and to a County Human

Resources employee, Rebecca Curry.

Defendants argue that plaintiff did not engage in a protected activity under the

WPA by reporting her safety concerns to Mr. Kloss, Ms. Heidt or Ms. Curry because they

are all Washtenaw County employees and "the County was not the appropriate 'public

body' with which to register those concerns under the WPA." [Defendants' Brief, p. 18.]

In support, Defendants rely on *Dickson v. Oakland University*, 171 Mich. App. 68, 429

N.W.2d 640 (1988).  In that case, the Michigan Court of Appeals determined that the

WPA did not protect a former Oakland University police officer who only reported a

student's violation of the law to his employer.  The *Dickson* court reasoned that the WPA

"is designed to protect employees who report suspected wrongdoing by their employer to

a higher authority from retaliatory discharge." *Dickson*, *supra* 171 Mich. App. at 70. The

26

court held that because the plaintiff only "reported the wrongdoing of students and others to his employer pursuant to his job function," his claim did not come within the meaning of the WPA. *Dickson, supra*, at 71. This aspect of the *Dickson* decision was affirmed by the Michigan Supreme Court in *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 77 n.4, 503 N.W.2d 645, 649 n. 4 (1993).[15]

The Michigan Court of Appeals revisited this issue in *Heckman v. Detroit Chief of Police*, 267 Mich. App. 480, 496, 705 N.W.2d 689 (2005). In that case, the plaintiff, a civilian employee of the Detroit Police Department, wrote a five-page letter in September 2002 to the then newly appointed chief of police detailing allegations of gross mismanagement and fraud within the department -- including the hiring of unnecessary employees who performed no meaningful work, misuse of overtime, falsification of time

---

[15] *Dudewicz* did abrogate a portion of the *Dickson* ruling in which the Court of Appeals stated that there was no violation of the WPA because Dickson only reported a student's violation of the law, not a violation of the law by his employer. The *Dudewicz* court determined that the WPA protected the reporting of violations of law by persons other than the aggrieved person's employer, as well as violations of law committed by employers. However, *Dudewicz* did not abrogate *Dickson*'s holding that in order to come within the protection of the WPA, the report must be made to an authority other than the employer. As explained by the *Dudewicz* court:

> [T]he plaintiff in *Dickson* reported the violation only to his employer, not to a public body within the meaning of the WPA. On these facts, the panel correctly found that the WPA was inapplicable. While its ruling was correct, the panel made an unfortunate comment in dicta stating that the purpose of the WPA was to protect only those employees who reported violations of law by their employers. It is this comment that is erroneous.

443 Mich. at 77 n. 4 (emphasis added).

27

records, misuse of government property, and premature payments of invoices -- and he forwarded a copy of the letter to Detroit Mayor Kwame Kilpatrick. In a meeting that was subsequently convened by the deputy police chief to discuss Heckman's letter, Heckman claimed that he was threatened by being told that he should start looking for a job elsewhere if he "kept making waves." 267 Mich. App. at 483.

In moving for summary disposition, the defendants argued that the plaintiff's September 2002 letter was not a "report" within the meaning of the WPA because it was not made to an outside agency; rather, it was merely an intra-agency complaint sent up the normal chain of command. Although the trial court granted the defendants' motion on other grounds without addressing this issue, when the defendants raised the issue again when the case was appealed, the Court of Appeals addressed it and held that "[t]o the extent that the WPA requires that a whistleblower report to a 'public body' other than the whistleblower's employer, we hold that plaintiff satisfied the requirement by forwarding a copy of his September 2002 letter to the mayor." Mich.App. at 495. The appellate court reasoned:

> [O]n the facts of this case plaintiff's report to the mayor satisfies the requirement of *Dickson-Dudewicz*. Although the mayor is the chief executive officer of the city, of which the police department is a part, the mayor's office and the police department are separate "public bodies" as that term is defined in the WPA.[16] Thus, a report to the mayor of

---

[16]  MCL 15.361(d) defines "public body," among other things, as:

( iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal

28

> wrongdoing within the police department constitutes a report to a "higher authority" under *Dickson-Dudewicz* and satisfies the statutory definition of "public body."

*Id.* at 496 (footnote added). *Cf., Phinney v. Perlmutter*, 222 Mich. App. 532, 553-54, 564 N.W.2d 532 , 555 (1997).

In *Phinney*, the plaintiff was a research scientist at the University of Michigan's Institute of Gerontology who accused her immediate supervisor, Perlmutter, of stealing her research. The plaintiff reported this theft to the Institute's director who appointed an investigator to review the matter.  The plaintiff also reported the alleged theft to a university personnel officer.  Plaintiff was later terminated from her position and filed suit for a violation of the WPA. The court found that the plaintiff had reported the violation to a "public body" as required in the WPA because the University of Michigan and its officials fit within the statutory definition of that term, and further found that the plaintiff's reports to the various officials were necessarily sufficient because they triggered a university police investigation.  However, in determining that the plaintiff was protected by the WPA, the court noted that the plaintiff was not required to report her

---

> corporation, or a board, department, commission, council, agency, or any member or employee thereof.
>
> * * *
>
> ( v) A law enforcement agency or any member or employee of a law enforcement agency.

supervisor's alleged theft as part of her "job function."

Plaintiff in this case argues that because she reported her complaints of safety violations to Rebecca Curry the "go-to person for all of Washtenaw County" for any type of employee relations complaint, the County should be viewed as a "larger umbrella entity [over the JDC] that is also a public body," and, therefore, by virtue of at least her report to Curry, she  should be found to have been engaged in a protected activity as defined under the WPA when she reported her safety concerns to her.  The Court disagrees.

Although Plaintiff Jennings' report to Rebecca Curry might seem to be substantially similar to the reports of the plaintiff in *Phinney*, it is not clear whether Ms. Phinney was a University employee or an independently grant-funded employee of the Institute of Gerontology.  There is no indication of any general university hiring or firing decisions in that case.  Rather, it was the a research scientist that hired her and she sued the Institute's director for retaliatory discharge.[17]  Furthermore, the Michigan appellate court in *Phinney* never really addressed the defendant's argument that the plaintiff's reports had to be made to a "higher authority" because the court found it sufficient that the University fit the statutory definition of a "public body" and that the plaintiff's reports to University employees triggered an investigation by a separate public body, i.e., the

_____

[17]  Phinney also sued the University of Michigan's Board of Regents for retaliatory discharge but that claim was dismissed on a motion for summary disposition which was affirmed on appeal.

30

university police, "a law enforcement agency" under the WPA.  *See* M.C.L. 15.361(d)(v).

The task of this Court is to apply the same law as would be applied by the Michigan state courts. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822 (1938); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999), *cert. denied*, 528 U.S. 871 (1999) ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising diversity jurisdiction."). Where a state's highest court has spoken to an issue, this Court is bound by that decision unless it is convinced that the high court would overrule it if confronted with facts similar to those presented here. *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 205, 76 S.Ct. 273, 277 (1956); *Kurczi v. Eli Lilly and Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997).

Here, the Michigan Supreme Court has spoken on the "higher authority" issue:

> [T]he plaintiff in *Dickson* reported the violation only to his employer, not to a public body within the meaning of the WPA. On these facts, the panel correctly found that the WPA was inapplicable.

*Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 77 n. 4, 503 N.W.2d 645, 649 n. 4. (1993).  This Court is not convinced that the Michigan Court would overrule its prior holding if confronted with the facts in this case.  Plaintiff was employed by Washtenaw County.  Everyone to whom Plaintiff reported her "safety concerns" was employed by Washtenaw County, including Rebecca Curry.  Furthermore, as Plaintiff herself admits, reporting safety issues to her superiors was part of Plaintiff's job function as a Juvenile Detention Center Attendant.  *See* Plaintiff's Dep., pp. 27, 107.  An employee does not

31

engage in a "protected activity" under the WPA by reporting unlawful conduct to her

employer in the course of her employment -- even if her employer is a public body.  *See*

*Phinney, supra*, 222 Mich. App. at 555; *Heckman*, *supra*, 267 Mich. App. at 494-95.

Under these circumstances, this Court believes that the Michigan Supreme Court would

hold that Plaintiff only reported the alleged safety violations to her employer, not to a

"higher authority" so as to render her reports of her safety concerns a "protected activity"

under the WPA.[18]

---

[18]  The Court confesses some discomfort with Michigan's WPA jurisprudence as it
has developed with respect to protections provided to public employees.
Notwithstanding the fact that no such requirement appears on the face of the statute,
Michigan courts have engrafted onto the statute a requirement that an employee who
works for a public entity engages in protected activity only when he or she reports a
violation or suspected violation of law to a "higher authority."  If the Michigan courts had
stopped there, perhaps this would be a faithful reading of the statute, which requires only
that the report be to a "public body."  However, the decisions appear to have gone further,
by requiring a public employee to, apparently, go beyond his or her immediate public
employer to some other public agency.  Not surprisingly, Michigan's lower courts have
struggled to harmonize the language of the statute and the predicament a complaining
public employee is in with the decisional requirements of the *Dickson* and *Dudewicz* line
of cases.  *See e.g.*, *Keller v. City of Grand Rapids*, 1998 WL 1992477 (Mich. App. 1998),
where the Court of Appeals reasoned:

> Since the employer in *Dickson* is a publicly-funded university, i.e., is a
> "public body" as defined in the WPA, for the Supreme Court to say in
> *Dudewicz* that *Dickson* was correct because the plaintiff reported a violation
> of law only to his employer, "not a public body within the meaning of the
> WPA," is to say, because the plaintiff's employer was otherwise a public
> body within the meaning of the WPA, that a complaint must be made to a
> higher authority to invoke the protection of the WPA.  That is the only
> explanation for what the Supreme Court said.

*Id.* at * 5.

     b.     Plaintiff Has Not Made Out a Cognizable WPA Claim Under
          the "About to Report" Prong of the Statute

Plaintiff argues, however, that even if her report of safety concerns to Ms. Curry is

not a "protected activity" under the statute, she also told Curry that she was going to file a

complaint with MIOSHA, and, therefore, is covered under the "about to report" prong of

the WPA.

To establish a claim under the "about to report" prong of the statute, Plaintiff must

show (1) by clear and convincing evidence that she or a person acting on her behalf was

about to report a violation or suspected violation of a law of this state, *see* M.C.L. §

15.363(4) (emphasis added); *Shallal v. Catholic Social Services*, 455 Mich. 604, 566

N.W.2d 571, 575 (1997); and (2) that the person who fired her was aware that she was

---

This may be the only plausible way to attempt to explain these rulings.
Nonetheless, this Court finds Michigan's jurisprudence on this issue so cribbed and
narrow as to undermine the policy behind the WP0th the private *and public* sector -- to
report wrongdoing without fear of reprisal. By requiring public employees to take their
complaints to another, different public agency before having the protections of the WPA
seems difficult in at least two respects. First, such a rule *discourages* employees from
attempting to raise issues of public concern through internally provided procedures before
going "outside" so that the public employer can take self-corrective and prompt action.
Second, and perhaps worse, this rule operates as an incentive to public employers to
discharge a complaining employee, and therefore cut off his or her WPA protection,
before the employer can go to a "higher authority" outside the agency. Neither of these
outcomes seem to further either the laudable goal of encouraging internal resolution of
grievances or public welfare concerns or the objectives of the WPA to protect workers --
including public employees -- who raise issues of pubic concern. And, of course, as
noted, this judicially created requirement is nowhere to be found in the statute.

If free to do so, this Court might hold otherwise under the facts presented here, but
sitting in diversity, the Court is bound by the precedents of the Michigan courts.

about to make a report before she was fired. *Kaufman & Payton PC v. Nikkila*, 200 Mich. App. 250, 247-58, 503 N.W.2d 728 (1993); *Saloka vv. Shelby Nursing Center Joint Venture*, 2005 WL 3304596 (Mich. App. 2005), *lv. denied*, 475 Mich. 889 (2006).

An employee who is "about to report" a violation or a suspected violation is one who "is on the verge of" doing so. *Shallal, supra*, 566 N.W. 2d at 575. "[T]he language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body." *Id.* at 576.

Here, it is undisputed that Plaintiff did not file a complaint with MIOSHA until July 25, 2005, ten days after she was terminated. Thus, she must present evidence to show that she "was on the verge" of filing a report with MIOSHA while she was still employed and that the person who fired her -- Larry Kloss -- was aware that she was about to file a report. The evidence presented by Plaintiff is insufficient to make these showings.

First, although Plaintiff testified in her deposition that she told Rebecca Curry that she was going to make a report with MIOSHA, she admits she did not tell Curry this when she made all of her other reports of safety concerns on July 5, 2005; rather, she testified that she told Rebecca Curry that she was going to file a MIOSHA complaint during one of the subsequent phone calls she made "inquiring about the status of the investigation that [Curry] was supposed to have been doing on her part." [*See* Plaintiff's Dep., p. 24.] This is the only evidence of record to which Plaintiff can point in support of her claim that she was "about to" file a MIOSHA complaint. Plaintiff, however, did not

34

state specifically when she made this alleged phone call nor did she provide any evidence that this phone call was made *before* she was terminated.

Ms. Curry confirmed that Plaintiff called her "a few times" after her conversation with her on July 5th when she lodged her safety concerns but did not remember her ever having said that she was considering filing a complaint with MIOSHA. [*See* Curry Dep., pp. 19, 34.] And, although Curry testified that she did not recall any of the specific dates of these post-July 5th phone, she did testify that Plaintiff may have called her once *after* she was terminated "to check up on the investigation." *Id.* at 34.[19]

---

[19] That Plaintiff continued to have contact with Curry after she was terminated is supported by the fact that Curry sent Plaintiff a memorandum after she was terminated advising her that her allegation of an unsafe work environment had been investigated and addressed. That memorandum is dated July 25, 2005 (i.e., ten days after she was terminated and, coincidentally, the same date on which Plaintiff filed her MIOSHA complaint). The memo advised Plaintiff as follows:

> The Human Resources department has received an allegation regarding an unsafe work environment created by Abigail Rowe.
>
> The complaint referenced that you were put in an unsafe situation due to the actions of another county employee. The county wants our employees to feel safe when at work so Human Resources contacted Children's Services to address the issue.
>
> This allegation was investigated. As a result of the investigation the individuals involved have been addressed. We are unable to give you any detailed information regarding any disciplinary action taken.
>
> This matter is now closed.
>
> If you have any questions regarding this matter, please feel free to contact me at 222-6823.

Since Plaintiff was not terminated until July 15 and did not file her MIOSHA complaint until July 25, the evidence of record suggests that it is conceivable that Plaintiff's phone call to Curry occurred in this ten-day interim, i.e., *after* she was terminated.

As indicated above, the WPA specifically provides that "about to report" claims require "clear and convincing evidence." *See* M.C.L. § 15.363(4). In opposing a motion for summary judgment, "any heightened burden of proof required by the substantive law for an element of the respondent's case ... must be satisfied by the respondent." *Street v. J.C. Bradford & Co., supra*, 886 F.2d at 1479; *Anderson v. Liberty Lobby, Inc., supra*, 106 S.Ct. at 2513 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.") A single unsubstantiated, uncorroborated deposition statement by the Plaintiff does not satisfy her evidentiary burden under the WPA to show by "clear and convincing evidence" that she was about to report a suspected safety violation to a public body before she was terminated. By way of comparison, *see Shallal v. Catholic Social Services, supra*, 455 Mich. 604, 566 N.W.2d at 576, in which the court found sufficient "clear and convincing evidence" where Plaintiff supported her claim of being about to report her supervisor's abuse of alcohol and agency funds to the Michigan Department of Social Services with deposition testimony that she personally told her supervisor she was going

---

[Plaintiff's Ex. 12.]

36

to report him *and* corroborated that testimony with a number of entries from her personal calendar that identified by date and name the people she spoke with about her intent to report her supervisor to the authorities.  *See also Fogwell v. Klein*, 2001 WL 1134883 (Mich. App. 2001), *lv. denied*, 468 Mich. 864 (2003), where the plaintiff, a dental hygienist, in addition to testifying as to her intent, provided evidence of having engaged in several activities that indicated she was about to report her employer's illegal billing practices to the Michigan Department of Consumer and Industry Services, including copying of her employer's records, attempts to contact the insurance hotline, and obtaining a copy of a CIS complaint form.

Based upon the foregoing, the Court cannot say that Plaintiff's single deposition statement that she told Rebecca Curry that she was going to file a complaint with MIOSHA in a telephone conversation that occurred on some unspecified date after July 5, 2005 constitutes "clear and convincing evidence" that she was "about to report" a suspected safety violation to MIOSHA before she was terminated.

However, assuming *arguendo* that Plaintiff has satisfied her evidentiary burden to show that she was "about to report" a suspected safety violation to MIOSHA, an "about to report" claim also requires evidence showing that, before firing her, the person responsible for her termination was aware that she was about to make a report to a public body.  *Kaufman & Payton, supra; Saloka, supra*.  Plaintiff here cannot make this showing.

Employers are entitled to objective notice of a threat to report by a whistleblower.

37

*Kaufman & Payton, supra*, 200 Mich. App. at 257-58, 503 N.W. 2d at 732.  Objective

notice has been interpreted by the courts to mean that the person who fired the employee

was aware of the protected activity in which the employee engaged.  *Id.  See also Saloka*

*v. Shelby Nursing Center Joint Venture*, 2005 WL 3304596 at * 5 (informing a manager

who was not involved in plaintiff's termination that she was going file a complaint with

the state held insufficient to establish that her employer was aware of her intent for

purposes of her WPA claim.)

 In this case, the evidence shows that Plaintiff told only Rebecca Curry that she was

going to file a complaint with MIOSHA.  Curry testified that she was not involved in the

decision to terminate Plaintiff; in fact, she testified that she did not learn that Plaintiff was

terminated until July 18, 2006, i.e., three days after she was fired. [Curry Dep., p. 32.]

And, Plaintiff has presented no evidence whatsoever to suggest that Ms. Curry informed

Larry Kloss or JDC Facility Manager Lisa Greco -- i.e., the individuals who were

involved in the termination decision -- that Plaintiff was going to go to MIOSHA before

she was terminated.

 For all of the foregoing reasons, the Court finds that Plaintiff has failed to establish

that she was engaged in a "protected activity" under the statute.

 2. <u>PLAINTIFF HAS FAILED TO ESTABLISH CAUSATION</u>

 Even if the Court were to find that Plaintiff was engaged in a protected activity,

her WPA claim fails because she has not presented any support for there being a causal

connection between her report or planning to file a report and her discharge.  All that

38

Plaintiff points to is the temporal proximity of her complaints of a safety violation by Ms. Rowe and her discharge.  However, it is settled that "a temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action.  Something more. . . is required to show causation. . . ." *West v. General Motors Corp.*, 469 Mich. 177, 186; 665 N.W. 2d 468 (2003); *Taylor v. Modern Engineering, Inc.*, 252 Mich. App. 655, 662, 653 N.W. 2d 625 (2002); *Saloka v. Shelby Nursing Center, supra*, 2004 WL 2204596 at * 6 n. 1.  Thus, the relative close temporal proximity between Plaintiff's complaints and her discharge, as a matter of law, is insufficient to raise an inference of retaliation.  *Taylor, supra*.

### 3.   PLAINTIFF HAS NOT ESTABLISHED PRETEXT

Assuming *arguendo* that Plaintiff has established a *prima facie* WPA claim, as in employment discrimination cases, once the plaintiff makes out a *prima facie* case, the burden shifts to the employer to articulate a legitimate "non-retaliatory" reason for its decision.  *Hopkins v. City of Midland*, 158 Mich. App. 361, 379, 404 N.W. 2d 744, 751-52 (1987).  Here, Defendants have proferred legitimate non-retaliatory reasons for Plaintiff's discharge -- violating policy 3.2-A13, failure to maintain relationships of mutual respect with her colleagues, as evidenced by Plaintiff's serious personality conflict with her co-worker, Michelle Douglas, and policy 3.2-A4, making statements critical of colleagues that are not constructive in purpose, as evidenced by the reports that Plaintiff had told other employees that Abby Rowe and George Brieloff were sexually involved.

Defendants having proffered a legitimate non-retaliatory reason, the burden of

production shifts back to Plaintiff to prove by a preponderance of the evidence that the legitimate reason offered was a mere pretext for retaliation. *Hopkins, supra*, 158 Mich. App. at 379, 404 N.W. 2d at 752; *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich.App. 270, 280-281, 608 NW2d 525 (2000). To do so, Plaintiff must demonstrate that the evidence in the case is sufficient to permit a reasonable trier of fact to conclude that Plaintiff's protected activity was a motivating factor in the adverse action taken by the employer. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 465, 628 N.W.2d 515 (2001) (quoting *Lytle v. Malady* (On Rehearing), 458 Mich. 153, 176, 579 N.W.2d 906 (1998)). "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston, supra* at 281, citing *Hopkins v. Midland*, *supra*, 158 Mich.App at 380.

    In support of her claim that the legitimate non-retaliatory reasons for her discharge are mere pretext for unlawful retaliation, Plaintiff argues that she and Ms. Douglas did not have a serious personality conflict and that she did not spread rumors of a sexual relationship between Mr. Brieloff and Ms. Rowe. Plaintiff's argument, however, misses the point. To establish pretext, Plaintiff must do more than establish that Mr. Kloss mistakenly believed she had a personality conflict with her co-worker or that she has spread rumors about Ms. Rowe and Mr. Brieloff; Plaintiff must show that Mr. Kloss did not actually hold those beliefs. *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 704, 568 N.W.2d 64 (1997) (finding that a plaintiff cannot establish pretext by simply

40

showing that "the employer's decision was wrong or mistaken, since the factual dispute is over whether [retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")

Plaintiff here cannot establish that Mr. Kloss did not believe that Plaintiff had a personality conflict with Ms. Douglas or had spread rumors about Mr. Brieloff and Ms. Rowe. On the contrary, the uncontradicted evidence of record demonstrates that Mr. Kloss did, in fact, hold those beliefs. Mr. Kloss testified that when he returned from vacation, he called Mr. Reed at home to learn whether Plaintiff and Ms. Douglas had heeded his advice to work professionally together during his absence, and Mr. Reed responded that things were "not good," that it had been a miserable week, and that Plaintiff and Ms. Douglas were not speaking to one another. [Kloss Dep., p. 44.]

Plaintiff has not offered any evidence whatsoever to contradict Mr. Kloss's testimony that Mr. Reed made this negative report. Instead, Plaintiff suggests that Mr. Kloss should not have relied upon Mr. Reed's statements and instead should have interviewed both she and Ms. Douglas. But, Kloss's decision to rely on Mr. Reed rather than interviewing Plaintiff and Ms. Douglas is not evidence of retaliatory animus. Mr. Kloss simply made a business decision to rely on the impressions of a trusted long-term employee and union official who had no reason to lie or exaggerate about the hostility he witnessed between Plaintiff and Ms. Douglas. Though Plaintiff may disagree with Mr. Kloss's decision to rely upon Mr. Reed's perceptions, challenging the wisdom of that decision does not establish pretext. *Town, supra*, 455 Mich. at 704.

Plaintiff's argument that the reasons given for her discharge were pretextual is further belied by the fact that Ms. Douglas, who had not engaged in any protected activities, was also disciplined for violating policy 3.2-A13 -- failure to maintain relationships of mutual respect with her colleagues -- based on Reed's report to Kloss concerning the conduct of Plaintiff and Ms. Douglas while Kloss was on vacation.  (Ms. Douglas, however, could not be terminated because, unlike Plaintiff, she had qualified for the protections of the CBA.)  The fact that another employee who had not engaged in whistleblower activities was disciplined for the same conduct as the Plaintiff clearly militates against a conclusion that in discharging her, Defendants retaliated against Plaintiff for engaging in protected activities.  *See Hicks v. Southern Md. Health Sys. Agency*, 737 F.2d 399, 403 (4th Cir.1984).

In sum, Plaintiff has come forward with no evidence whatsoever to support her contention that she was discharged in retaliation for having engaged in a protected activity under the WPA.  There is absolutely no evidence of record showing that her employer was in any way upset with her for having reported the safety violations she perceived in Abigail Rowe's actions on June 25, 2005.  To the contrary, her supervisor and the other management personnel at the JDC all agreed that Ms. Rowe had committed a safety violation and they promptly acted upon Plaintiff's complaint and disciplined Ms. Rowe for her actions.

For all of the foregoing reasons, the Court finds that Plaintiff has failed to make out a Whistleblowers' Protection Act retaliation claim.

42

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED.  Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, WITH PREJUDICE.

Let Judgment be entered accordingly.

<u>s/Gerald E. Rosen</u>
Gerald E. Rosen
United States District Judge

Dated:  February 28, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 28, 2007, by electronic and/or ordinary mail.

<u>s/LaShawn R. Saulsberry</u>
Case Manager